2022 IL App (2d) 210262-U
No. 2-21-0262
Order filed June 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-144 |
| SYLVESTER P. WHITE, | ) ) ) | Honorable Michael P. Bald, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant was properly convicted of unlawful possession of a weapon by a felon based on circumstantial evidence of his actual possession of a firearm. A witness testified that defendant robbed him at gunpoint. After defendant was apprehended in hot pursuit, the police retraced the path of his flight through a residential neighborhood and found a handgun on the ground near where he was seen scaling a fence into an adjoining yard.

¶ 2   In this appeal, defendant, Sylvester P. White, contends that the State failed to present sufficient evidence to support his conviction of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)). He contends that the State relied entirely on two pieces of evidence: (1) the unreliable testimony of an alleged armed robbery victim and (2) the discovery,

of a gun in a high-crime neighborhood yard that the State failed to prove he passed through. We disagree with defendant's characterization of the evidence. First, although the alleged victim did not present himself as a perfectly reliable witness, his account was corroborated at several critical points such that the trier of fact could reasonably rely on it. Second, taking the evidence in the light most favorable to the State, the trier of fact could have reasonably inferred that the gun was lying about three feet from where defendant crossed a fence as the police were closing in on him. That inference supported a further reasonable inference that defendant had actual possession of the gun before he dropped it, whether intentionally or accidentally. Therefore, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     Defendant was charged by complaint with one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2020) and two counts of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)). The complaint charged that, on May 21, 2020, defendant, "while carrying a firearm on his person, knowingly took property, being approximately $1010 United States Currency, from the person of Willie Ishmon, by threatening the imminent use of force." One of the unlawful possession counts alleged that defendant was on mandatory supervised release (MSR) when he committed the offense, while the other count alleged that he had a prior conviction of a forcible felony, *i.e.*, armed robbery. Defendant was also charged with resisting arrest in a separate misdemeanor case. He does not challenge that conviction.

¶ 5     At defendant's bench trial, the parties stipulated that (1) on May 21, 2020, defendant was on MSR, (2) defendant had a prior conviction of armed robbery, and (3) on May 21, 2020, the police recovered an operable semiautomatic pistol, which was examined for fingerprints but none were found. The parties also stipulated to the authenticity of a video taken on May 21, 2020, by a security camera outside the Horizon Supermarket (Horizon) in Freeport.

¶ 6     Defendant objected to the admission of Ishmon's identification of him at a showup.  The court overruled the objection, and the State presented evidence of the showup.  However, identity is not at issue in this appeal.

¶ 7     Ishmon testified for the State.  On direct examination, he agreed that he had prior convictions of attempted residential burglary and domestic battery; there was also a pending petition to revoke probation in the domestic battery case.  When the State asked Ishmon about the events of May 21, 2020, he repeatedly said that he did not remember any details.  He said that, because the money taken was his rent money and he was worried about his family being homeless, he did not listen carefully to the police officer who questioned him after the incident.

¶ 8     Ishmon testified that, on May 21, 2020, he was walking along a street near Horizon when he "got hit with a [sic] arm" and his money was "grabbed out of [his] pocket."  He agreed that he probably told a police officer that he had about $1010 taken from him.  He also agreed that he told the officer that this happened on "High [Avenue]" and that the robber "jumped that fence [behind Horizon] and got into a black car."  When asked if he told the officer that "Little Paris" was the person who had the gun, he said, "Yeah, I probably—I probably went—like a lot of things I don't remember, you know what I mean, what [the officer] was talking about."  Asked again if he told the officer that the robber was "Little Paris," defendant said, "I don't remember."  Ishmon continued on direct examination:

> "Q. You told the police that it was Little Paris that robbed you though, right?
>
> A. All I knows I probably said Sylvester but, you know what I mean.
>
> Q. Okay. When you—so when you identified—you identified this [d]efendant that night as the guy that robbed you?

A. He—he had the orange jacket on, that's why I know he had a orange—an orange jacket on, so—

Q. Okay.

A. —whoever robbed me, I pointed out the person with the orange jacket that they had on—

Q. Okay.

A.—you know.

Q. And you knew him as Little Paris though, right?

A. If that's—did I say that?

Q. I'm just asking you, do you remember that?

A. I just know they pulled over and said was it Sylvester and from the jacket that he had on I agreed, because the jacket was—you know what I mean, was the person that had the same jacket that robbed me, you know. And it was—it was dark, I really couldn't see no—I just know the jacket. I'm like, he has that jacket, because they kept on going off the same jacket as me too, you know what I mean, was the person with the jacket. Well— well—because I really didn't—I really couldn't see the face like that because at the same time like he came behind me with the gun, you know what I mean, came from behind me—

Q. Okay.

A. —got me down, you know what I mean."

Thus, Ishmon testified that, though the robber approached from behind and he "really couldn't see the face," he did see that the robber had a gun and wore an orange jacket.

¶ 9    Ishmon testified further about the robber's possession of a gun:

Q. So you do remember a gun now then, right?

A. Yeah, I just don't know whether—he's talking about what color and all this, I don't know what color, you know I'm—

Q. Tell me about that, you said that he came from behind you with a gun, was that when you were on High Street?

A. See that's why I say I don't know if it was Horizon or High when—when it happened, like Horizon or High Street when it happened. I just know I was just leaving Horizon, you know what I mean. I don't know that it's Horizon or—or High Street. It's so long ago that it's in that vicinity in that area, you know what I mean.

Q. The—okay, so you do remember a gun? Somebody pulling a gun on you?

A. Yeah, yeah.

Q. Okay. And did you get down on the ground at his request, whoever told you, whoever pulled the gun on you?

A. Man, I got down and I emptied my pockets, that's what I did, and got out of there.

Q. And then you had money in your pocket?

A. Yeah, I had money.

Q. And about $1,100?

A. Man, it was a lot of money. I don't know the equal of—I don't know exact amount, you know what I mean, because I don't—

Q. Did that person take it from you? The money in your pocket?

A. Yeah, yeah. How else he—would the person had the money?

Q. That's a good point.

A. You know what I mean.

> Q. So you had about $1,100 on you?
>
> A. Yeah, I just got down on the ground, I emptied everything, got—you know what I mean, m*** took—I took off.

Ishmon testified that he chased the robber, who then got into a black SUV. After chasing the black SUV unsuccessfully, Ishmon went to his mother's house. Ishmon later testified that defendant was known as "Little Paris." Ishmon "knew [defendant] as a child." Ishmon believed that he had told the police that "Sylvester" was the robber.

¶ 10    Donald Heath, a former Freeport police officer, testified that he interviewed Ishmon on May 21, 2020. Ishmon was on the porch of his mother's house. Heath's body camera recorded the interview; Heath authenticated the recording, which was played in court.

¶ 11    In the recording, Heath is generally audible, but Ishmon's voice is frequently muffled— our transcription is approximate. Heath approaches Ishmon, who is sitting on the porch of a house with other people going in and out. Ishmon appears to be typing on his phone throughout the interview. Heath asks Ishmon what happened, Ishmon says something inaudible, and, after Heath says, "Which one?" Ishmon replies, "He had a jacket on, like a yellow jacket." Heath tells Ishmon that "they have everybody stopped." Ishmon expresses concern about his stolen money, which was about $1010. He says it was his rent money. He repeatedly asks if there is any way to get the money back right away; he seems to suggest that he does not want to talk to the police unless they will return the money right away.

¶ 12    Heath asks him if he knew "any of the offenders." Ishmon replies, "No, it happened so quick." Asked how many people were involved, Ishmon says that there was just one; he robbed Ishmon on High Street, then jumped over the fence behind Horizon and got in a black SUV in

Horizon's parking lot. Ishmon chased him. Asked what kind of gun the robber had, Ishmon said that it was "brown and black."

¶ 13    Heath asks Ishmon to go look at the person the police had arrested. Ishmon asks if his cooperation will help him get his money back. Heath tells Ishmon that it is not a negotiation. Heath asks Ishmon what the "guy in the yellow jacket" looked like. Ishmon says that the jacket was orange or orange-yellow. Heath asks if that was the person who had the gun. Ishmon says, "Yeah," and volunteers that "they call him Little Paris." Heath asks what Little Paris said to him; Ishmon responds with a phrase that includes "on the ground." Ishmon's money was in his pants pocket; Little Paris took it out of his pocket while he was lying on the ground. After some further discussion, Ishmon agrees to go to the showup. At the showup, Ishmon identifies defendant as "Little Paris."

¶ 14    Ishmon later told Heath the denominations of the bills taken from him: six $100 bills, one $50 bill, and the rest in $20 bills.

¶ 15    Nicholas Rosenstein, a Freeport police officer, described his role in a car and foot chase that led to defendant's arrest. At about 8:08 p.m. on May 21, 2020, he received a dispatch about an armed robbery at Horizon. Rosenstein explained in a narrative what happened next:

> "[O]fficers responded to 1130 South Galena, which is [Horizon,] [with] regards to an armed robbery complaint, the victim complainant caller was a Willie Ishmon. Willie advised that he had been robbed *** at gunpoint in the area and that he *** located and followed the suspect who got in a vehicle, the vehicle travelled on South Galena and turn eastbound on East Garden. Willie advised this to dispatch and said that he was following the suspect *** on foot. I approached the area in my fully-marked squad vehicle, I had my emergency lights activated in my fully-marked squad vehicle in an attempt to locate Willie

and to speak with him regarding this incident. I turned on East Garden in an attempt to locate Willie to speak with him regarding this, I didn't see anybody in the area ***.

*** Officer [Dehvan] Truckenmiller and Officer [Richard] McElmeel *** advised [by radio] that they observed a vehicle matching the description that Willie had provided ***. They performed a traffic stop on the vehicle which led *** [to] a brief pursuit ***. ***

*** Officer Truckenmiller advised that one of the suspects in the vehicle that he had recognized earlier in the day had fled from the vehicle, the suspect was named by Officer Truckenmiller as Sylvester White."

¶ 16 Rosenstein testified that Truckenmiller described the suspect as wearing an "orange sweater" and as "running northbound from the southeast side of 433 [East] Prospect, which is the corner of South Float and East Prospect." Rosenstein drove to try to intercept the suspect. As Rosenstein approached the intersection of East Center Street and South Float Avenue, he saw Truckenmiller pursuing a subject wearing orange. Rosenstein left his squad car to pursue the subject on foot. As he ran toward the subject, the subject surrendered and got on the ground. The officers identified the subject as defendant.

¶ 17 The officers searched defendant, finding a "large amount" of cash in one of his pants pockets but no weapon. As Rosenstein was about to place defendant in the squad car, defendant said something like "all this for a petty ass warrant." Once Rosenstein had defendant at the police station, he inventoried the cash, finding a total of $1015, including 6 $100 bills, 1 $50 bill, 18 $20 bills, and 1 $5 bill. About 10 minutes after he arrived at the station, a superior told Rosenstein to take defendant to a showup at a nearby parking lot. Rosenstein complied.

¶ 18    The State played in court what Rosenstein identified as a video from his squad car's dashboard camera. The video shows, among other things, the moment when Rosenstein first saw defendant, with Truckenmiller in pursuit. Rosenstein's squad car approaches a T-intersection and stops, directly facing a row of homes. When he first appears, defendant is jumping a chain-link fence into the rear of a yard between two houses. Defendant runs to the front of the yard, passes through a gate, and runs across the front of a house. Truckenmiller appears and pursues defendant out of frame.

¶ 19    Truckenmiller, a Freeport police officer, testified to his part in the apprehension of defendant. Truckenmiller and fellow Freeport officer McElmeel were on patrol when they heard a radio report of a black Mazda SUV associated with a robbery. They spotted the SUV and attempted to pull it over. The SUV ran the stop signs at two intersections before halting "between Float and Benton on Wyandotte." Truckenmiller saw defendant exit the SUV and flee on foot through the back yards of the houses on East Prospect Terrace. Truckenmiller pursued him on foot. The State played in court what Truckenmiller identified as a video from his squad car's dashboard camera. Truckenmiller testified that the video showed the pursuit of the SUV, defendant's flight on foot, and the beginning of Truckenmiller's foot pursuit. Truckenmiller testified that, during the foot pursuit, defendant crossed East Prospect Terrace as Stephenson County Sheriff's deputy Kevin Krahmer arrived on the scene. Defendant turned and ran behind a vacant apartment building; Truckenmiller took a different course to cut defendant off, which allowed him to see defendant in the backyard of 433 East Prospect Terrace. Truckenmiller intercepted defendant and arrested him.

¶ 20    Once defendant was secured, Truckenmiller, McElmeel, and an officer with a police dog retraced defendant's path of flight. At "the corner of all the backyards, which is 425 through 431,

433 [East Prospect Terrace] and 1008 South Float," Truckenmiller found a black Taurus .40 caliber semiautomatic pistol in the backyard of 1008 South Float Avenue. The gun was loaded. The State asked how the gun's location related to defendant's path of flight. Truckenmiller, apparently referencing Rosenstein's dashcam video, says that it shows defendant running through a gate at 433 East Prospect Terrace, which is on a lot abutting 1008 South Float Avenue. The State then led Truckenmiller through a series of video recordings that document the relationship between defendant's flight path and the location of the gun.

¶ 21    The State played in court what Truckenmiller identified as a security-camera recording from Horizon's parking lot. Truckenmiller narrated the events as follows. At about 8:01 p.m., the black Mazda SUV that was later involved in the police chase arrives in Horizon's parking lot. The black SUV pulls alongside a similar blue Mazda SUV. About a minute later, at two least people, including one identifiable as defendant by his orange shirt, get out of the vehicle. At about 8:03 p.m., Ishmon exits Horizon and walks down the sidewalk headed northwest on Galena until he exits the frame. Shortly after Ishmon exits the frame, defendant runs behind Horizon. At about 8:04 p.m., defendant reappears and gets into the front-passenger seat of the black SUV. The black SUV drives away. At about 8:06 p.m., the black SUV returns to the parking lot, where it is mostly out of view behind a grey van. At about 8:07 p.m., defendant jumps the fence into the parking lot near the van. He runs around the van, and, shortly thereafter, the black SUV pulls out of the parking lot. Soon, Ishmon enters the frame running down the sidewalk in the same direction as the black SUV.

¶ 22    On cross-examination, Truckenmiller agreed that the area in which he found the gun was a high-crime area and that reports of abandoned guns were not uncommon. He recalled previous calls relating to violent crimes in that general location. The area had many vacant buildings;

Truckenmiller agreed that "transients" were known in the area. He had received domestic violence calls to 1008 South Float Avenue. He also agreed that he actually "never saw" defendant in the backyard of 1008 South Float Avenue, where the gun was recovered. On redirect examination, he explained that only a fence separated the yards of 1008 South Float Avenue and 433 East Prospect Terrace (it was near the latter yard that Truckenmiller caught up with defendant). Truckenmiller also testified that, in Rosenstein's dashcam video, the gun was lying about three feet from where defendant appeared to cross the back fence.

¶ 23     Heather May, a forensic scientist with the Illinois State Police, described her testing of the gun for DNA traces. She found traces of DNA from at least five individuals in swabs taken from the gun, but none of the samples were suitable for comparison with known DNA samples.

¶ 24     Deputy Krahmer testified about his participation in the pursuit of the black Mazda SUV and defendant. He learned of the pursuit by radio and joined because he was nearby. When he saw defendant flee on foot, he pursued him in his vehicle. He pulled into a vacant lot and tried to chase defendant on foot. Defendant jumped a fence behind "425/431 Prospect Terrace." Krahmer circled back and saw Freeport police officers arrest defendant. He continued:

"Q. *** What did you do after you saw the defendant being taken into custody?

A. I returned to my squad car and went back to that area as Freeport police officers were in that area as well, and they located a firearm that was—it was found right near that same location where the defendant had previously stopped when I first got out of my squad car and took off running."

¶ 25     At the State's request, Krahmer traced his route on an aerial street map admitted into evidence. Also, the State played what Krahmer identified as a video from his squad car's dashboard camera. Krahmer noted points in the video where defendant is running. Krahmer

acknowledged that, after defendant was arrested, two people could be seen running through the vacant lot where he had stopped his vehicle. Krahmer did not know who they were.

¶ 26    Krahmer described the area where the gun was found:

> "It was—that area, there are several fences that meet in that area for several adjoining properties. There was heavy brush, everything was dirty, there was trash and everything else. The firearm was laying there, clean appearance ***—it looked like it had not been there for a very long period of time due to everything in the area being dirty, weathered, and the firearm was not."

¶ 27    On cross-examination, Krahmer testified he said that he saw defendant in the backyard of 1008 South Float Avenue but did not see him directly behind the house:

> "Q. You didn't see [defendant] behind that building or house in the bushes, correct?
>
> A. I did.
>
> Q. You didn't see him directly behind that house?
>
> A. Correct, I did."

¶ 28    On redirect examination, Krahmer agreed that the area where he saw defendant stop and jump the fence was where the Freeport police found the gun.

¶ 29    McElmeel of the Freeport police testified that he interviewed defendant after his arrest. Defendant denied involvement in an armed robbery. When asked why he jumped the fence at Horizon, he said that that was his usual way of getting there. The State played what McElmeel identified as his body camera video of the interview. In the interview, McElmeel tells defendant that, because he was sweating, DNA testing will show that he was holding the gun.

¶ 30    The State rested after McElmeel's testimony, and the defense presented no evidence.

¶ 31    The court found defendant (1) guilty of the unlawful-possession-of-a-weapon-by-a-felon charges and the resisting-arrest charge but (2) not guilty of armed robbery:

"The victim in this case, Willie Ishmon, is viewed on video tape in the case after he claimed he *** had been held up by this Defendant.  The victim *** largely backed off of his claims *** from immediately after the event ***— he had claimed that the Defendant took approximately $1,000—and I think it might have been a thousand and ten dollars—in cash by threatening the victim with the handgun.  Now Ishmon somewhat backed off his identification in court, but the original identification viewed on video tape is where ***the Court does, *** in part, place believability.  There is reason to doubt this, based on the cross-examination that took place in the original appearance by him and his claims. As to the charge of armed robbery, this Court finds the State falls short of proof beyond a reasonable doubt.  The Court finds many problems with what exactly took place when the victim had turned over the money in question.

Now considering the remainder of the testimony here, the Court does find believable the testimony of the victim about the Defendant possessing a handgun at the time in question.  It should be noted here that this was followed by the video of the chase of the Defendant when the police became involved.  He did try to flee from the police when told not to and that is an authorized act of the police in furtherance of their duties. Thus, the Defendant is convicted of the offense of resisting a peace officer and will be sentenced on that charge.

Now as to the weapons charge, this Court realizes the weapon was examined by the State Police crime lab and it was found to have no suitable prints for comparison and, thus, no print evidence to match the Defendant to the gun.  Also missing was any DNA evidence

and they had no connection to the Defendant through the use of the forensic evidence. However, we do have the testimony of the victim, Willie Ishmon, describing the gun on the night in question, along with the identification of this Defendant in the showup, where under the conditions at the time the Court finds acceptable under the case law with the immediacy and the expediency of the police action. So I'm accepting that identification in that fashion.

Further, the location of the weapon and the location of the Defendant had just traversed during the course of his flight is enough, despite the arguments to the contrary from the defense of that being a high crime area and the argument that the Defendant was fleeing from a simple warrant."

¶ 32 Defendant moved for reconsideration of the guilty findings, arguing that the evidence was insufficient to meet the State's burden of proof on the unlawful-possession counts. The court denied the motion, noting, among other things, that it credited Ishmon's statement that he had seen a gun during his encounter with defendant.

¶ 33 The court ruled that the two unlawful-possession convictions merged. The court sentenced defendant to four years' imprisonment on the unlawful-possession (MSR) conviction and 180 days' jail on the resisting-arrest conviction. Defendant moved for reconsideration of his sentence, the court denied the motion, and defendant timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35 On appeal, defendant argues that, "in light of the profound lack of evidence adduced at trial, the trial court erred in finding that the State had met its burden and proved beyond a reasonable doubt that [he] was ever in possession of a gun":

"While police did recover a gun from a backyard somewhere in the general area where [he] may have run, the State was unable to link [him] to that gun in any credible way. No officer saw [him] with a gun. No officer saw [him] throw or otherwise dispose of a gun. No officer saw [him] in the backyard in which the gun was later found."

¶ 36    The State responds that there was "ample direct and circumstantial evidence that defendant actually possessed a gun when he robbed the victim." The State points to (1) Heath's conversation with Ishmon in which he reports that the person who robbed him had a black and brown gun, (2) Ishmon's correcting Heath by noting that the robber wore orange, not yellow, and (3) Ishmon's identification of the robber as "Little Paris," whom he knew from childhood.

¶ 37    In reply, defendant points out that, given that the court found defendant not guilty of armed robbery, it is improper to say that defendant robbed Ishmon. Further, he argues, "The State's entire case is supported by just two pieces of evidence: the incredible testimony of Willie Ishmon and the discovery of a gun in a random yard in a high crime area that [defendant] may or may not have passed through."

¶ 38    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

"Under [the *Jackson*/*Collins* standard], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.] But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision. A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt. [Citation.]" *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 39 Also, the *Jackson*/*Collins* standard is applied "regardless of whether the evidence is direct or circumstantial [citation], and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction." *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). When the State's case is based on circumstantial evidence,

"[t]he trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Jackson*, 232 Ill. 2d at 281. (Internal quotation marks and citations omitted.)

¶ 40 Possession of contraband may be either actual or constructive. To show actual possession, the State must show that the contraband was "in the immediate and exclusive control of [the] defendant." *People v. Frieberg*, 147 Ill. 2d 326, 360 (1992). "Mere proximity is not sufficient evidence of actual possession." *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000). Actual possession

requires that the defendant exercise "present personal dominion" over the contraband; such possession exists when the defendant "exercises immediate and exclusive dominion or control" over the contraband. *Schmalz*, 194 Ill. 2d at 82. However, "[a]ctual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it." *Schmalz*, 194 Ill. 2d at 82. The State may show actual possession through acts such as hiding or trying to dispose of the contraband. *E.g.*, *People v. Carodine*, 374 Ill. App. 3d 16, 25 (2007). By contrast, a defendant has constructive possession of contraband when he or she lacks "actual personal present dominion" over the contraband, but nevertheless has "an intent and capability to maintain control and dominion." *Frieberg*, 147 Ill. 2d at 361.

¶ 41 Here, if the State proved possession at all, it must have been actual possession. There is no indication that defendant intended to hide the gun in the backyard of 1008 South Float Avenue to maintain control of it. Indeed, there is little evidence to indicate whether defendant tossed the gun aside or accidentally dropped it. Therefore, the State must rely on the theory that defendant was in *actual* possession of the gun *until* he either lost it or disposed of it in the backyard of 1008 South Float Avenue. We conclude that the State met its burden of proof in showing that defendant had actual possession of the gun.

¶ 42 Defendant asserts that the police found the gun "in a random yard in a high crime area that [he] may or may not have passed through." He argues that "the officers who pursued [him] unequivocally stated that they never saw him in the yard or near the bushes where the gun was discovered." He points out that Truckenmiller agreed that he never saw defendant in the backyard of 1008 South Float Avenue. He contends that Krahmer also agreed that he did not see defendant in that yard. We disagree.

¶ 43   Defendant's argument is correct but beside the point as to Truckenmiller's testimony and incorrect as to Krahmer's testimony.   First, when shown Rosenstein's dashcam recording, Truckenmiller testified that defendant was within about three feet from where the gun was found. The video pinpoints defendant's location far better than memories of personal observations during the heat of the chase.   Second, Krahmer stated on cross-examination that he saw defendant in the backyard of 1008 South Float Avenue but did not see him directly behind the house.   Krahmer confirmed on redirect examination that the area where he had seen defendant stop and jump the fence was where the Freeport police found the gun.

¶ 44   As we understand the evidence, defendant was penned in within the block containing 1008 South Float Avenue and 433 East Prospect Terrace by the convergence of Rosenstein, Truckenmiller, and Krahmer.   We are deferential to the trial court as to the strength of the evidence placing defendant near where the police found the gun.   We have reviewed the testimony, the aerial street map, and all the admitted video recordings.   We have followed, within practical limits, the testimony in which witnesses point out where specific events happened in the videos and on the aerial street map.   In our view, the evidence supports the conclusion that the police found the gun near where defendant jumped a fence and near where defendant would have seen Rosenstein's squad car appearing in his path of flight.   Truckenmiller testified that only a fence divided the yard at 1008 South Float Avenue from the yard at 433 East Prospect Terrace, near which he caught up with defendant.   He said that the gun was lying about three feet from where defendant, in Rosenstein's dashcam video, jumped a backyard fence.   This is consistent with Krahmer's testimony that the area where he saw defendant stop and jump the fence was where the Freeport police found the gun.

¶ 45     Based on this evidence, the court could have reasonably inferred that the gun was lying about three feet from where defendant crossed a fence. That inference supports a further reasonable inference that defendant either (1) dropped the gun accidentally as he crossed the fence or (2) threw it aside as he saw police approaching.

¶ 46     Next, we disagree that Ishmon's testimony was not credible. Certainly, Ishmon did not present himself as a perfectly reliable witness. However, Ishmon's statement to Heath and his testimony were corroborated at several critical points. Consistent with what Ishmon reported, video from Horizon showed defendant jumping the parking lot fence and then—although the view is obstructed—apparently getting into the black Mazda SUV that the Freeport police later stopped. The same video shows Ishmon running in a direction consistent with his report that he chased the robber fleeing in the SUV. Defendant was carrying currency closely matching the amount and denomination of the currency that Ishmon said the robber had taken from him. Defendant was wearing orange, consistent with Ishmon's statement to Heath that spontaneously corrected Heath's comment that the robber was wearing yellow.

¶ 47     Defendant argues that Ishmon's statements that he saw a brown and black gun are inconsistent with his statement that the gunman approached him from behind. We disagree. Ishmon was not forthcoming about the specifics of the purported armed robbery, so it was not clear when he saw the gun. However, Ishmon unambiguously stated that he saw defendant hop the fence and get into the car. Moreover, he identified the gunman as "Little Paris" and saw that he was wearing orange. If he could observe any of these things, he could also observe a gun. And other evidence corroborated his statements that the gunman was wearing orange and jumped the fence. Defendant points out that the gun found was all black, whereas Ishmon described a black and brown gun. This is a minor discrepancy.

¶ 48    Of course, Ishmon could have been honest about much of what occurred between him and defendant but lied about defendant having a gun.  However, Ishmon's report of a gun makes it far less likely that finding a gun where defendant crossed a fence during a hot pursuit was a coincidence.  As we noted, the "trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt."  *Jackson*, 232 Ill. 2d at 281.  Given the several lines of evidence presented by the State, it is improbable that defendant was not the source of the gun.

¶ 49    Defendant argues that the lack of fingerprints or DNA linking him to the gun are positive evidence that he did not handle the gun; he implies that, if he handled the gun, such evidence would be *expected*.  Defendant offers no support for this proposition other than McElmeel's statement to defendant that, because he was sweating, the police would be able to find traces of his DNA on the gun.  We have no reason to think that McElmeel believed this comment, which was obviously made to get defendant to inculpate himself.  In any event, McElmeel was not an expert in DNA evidence.  We give no weight to his statement that he expected that the crime lab would find defendant's DNA on the gun.

¶ 50    Defendant argues that this case strongly resembles *People v. Wright*, 2013 IL App (1st) 111803, in which the First District held that the State's evidence was insufficient to prove the defendant's possession of a firearm.  According to defendant, "[t]he facts in this case are less indicative of possession than those in *Wright*, and so [his] conviction for possessing a firearm should similarly be reversed."

¶ 51    The facts here have little resemblance to those in *Wright*.  In *Wright*, several police officers, executing a search warrant, entered a residence through an unlocked door.  The defendant and

another person, Quentin Mitchell, fled toward a flight of stairs to the basement. An officer saw Mitchell fall over the defendant on the way down, and the two suspects came to rest next to each other near a wall. *Wright*, 2013 IL App (1st) 111803, ¶ 7. The basement had three other occupants at the time. The officer "observed a handgun 'just to the left of' and 'within inches of Mitchell's left hand.' " *Wright*, 2013 IL App (1st) 111803, ¶ 7. A second officer "announced there was another gun present"—"a 'Colt 45,' which was attributed to [the] defendant." *Wright*, 2013 IL App (1st) 111803, ¶ 7. A third officer testified that, as he descended the stairs, he saw a gun sticking out from under the defendant's torso as he was prone on the floor. *Wright*, 2013 IL App (1st) 111803, ¶ 10.

¶ 52    The First District held that the State "failed to prove beyond a reasonable doubt that [the] defendant knowingly possessed the gun that was attributed to him." *Wright*, 2013 IL App (1st) 111803, ¶ 26. The court noted that, although two officers "testified the gun was found underneath [the] defendant, neither officer testified that [the] defendant made any movements to indicate knowledge of a weapon." *Wright*, 2013 IL App (1st) 111803, ¶ 26. The court also noted that the basement was occupied by three other people when the defendant and Mitchell fell down the stairs. The court concluded that the evidence failed to show that the defendant "exercised immediate and exclusive control over the basement area where the gun was found." *Wright*, 2013 IL App (1st) 111803, ¶ 26. In short, when the defendant and another fell down a flight of stairs into a room with three other occupants, the fact that defendant was found on top of a gun was not sufficient evidence that the gun was his.

¶ 53    *Wright* involved a complicated pileup of at least two people at the bottom of a staircase. The evidence supported at least one other straightforward explanation for the location of the gun attributed to the defendant: that Mitchell was carrying two guns. But the gun could also have

belonged to someone who was already in the basement. In contrast to what occurred here, no striking coincidence would be needed for the defendant to be innocent. We acknowledge that the presence of unidentified people running through the general area in which the police found the gun, as seen in the recording from Krahmer's dashboard camera, slightly increases the odds in favor of a coincidence. However, their presence does not make the backyard corner where police found the black semiautomatic gun comparable to the site of the *Wright* defendant's chaotic tumble down a flight of stairs.

¶ 54                                    III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 56    Affirmed.